IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT,
IN AND FOR BREVARD COUNTY, FLORIDA

11717 81ST PLACE LAND TRUST,
By: BCP Management, LLC, as Trustee

    Plaintiff,

v.                                        Case No.:

DEUTSCHE BANK NATIONAL TRUST COMPANY,
as Trustee, on behalf of the Registered Holders of
GSAMP Trust 2005-HE3, Mortgage Pass-Through
Certificates, Series 2005-HE3,

    Defendant.
_____/

# COMPLAINT
## AND DEMAND FOR JURY TRIAL

Plaintiff, 11717 81ST PLACE LAND TRUST, By BCP Management, LLC, as Trustee ("Plaintiff"), hereby files this lawsuit against Defendant, DEUTSCHE BANK NATIONAL TRUST COMPANY, as Trustee, on behalf of the Registered Holders of GSAMP Trust 2005-HE3, Mortgage Pass-Through Certificates, Series 2005-HE3 ("Defendant"), and would show:

1. All conditions precedent to the filing of this action have been met, waived, or otherwise satisfied.

2. Venue is proper in Brevard County, Florida, as the cause of action alleged herein accrued here.

3. On or about January 25, 2005, Richard Lee Soto ("Soto") entered a promissory note ("the Note") and mortgage ("the Mortgage") with Southstar Funding, LLC ("SF"), which mortgage was recorded in the Pinellas County Official Records in connection with their purchase of the property at 11717 81st Place in Seminole, Florida ("the Property).

4.	Instead of operating merely as a lien on the Property, as required by Florida Statute § 697.01, the Mortgage read like a contract, requiring the remittance of monetary payments, including payments of property taxes and insurance.

5.	Shortly after closing on the Loan, SF sold the Note to a third-party depositor ("the Depositor"), which bundled them together with many other promissory notes (collectively "the Notes" or "the Loans") for the purpose of creating a trust.

6.	Upon the creation of the trust, a prospectus was generated and disseminated to investors for the purpose of selling Certificates (identified as Notes of the trust), and the investors purchased said Certificates, making them Certificateholders in the trust. The Depositor then assigned the cash flows from the Loans to the Trust. In this case, the Trust was called GSAMP Trust 2005-HE3 ("the Trust").

7.	Pursuant to the terms of each prospectus, the cashflows from the Loans were used as collateral, and the Trust issued securities. The Certificateholders had no ownership interest in the Loans, but were paid monthly payments from the cash flows from the Loans as the borrowers on the Loans ("the Borrowers") made their monthly Loan payments. Significantly, the amounts received by the Certificateholders were fixed and did not in any way hinge on whether the Borrowers actually made their monthly payments.

8.	Pursuant to H.R. 4557 Investment Company Act of 1940, as modified by H.R. REP 98-994, 98-293 STAT. 1689 Secondary Mortgage Market Act of the 98th Congress, the Trust did not own or hold any of the Notes or the mortgages for which the Notes acted as security ("the Mortgages"). In fact, Section 310(b)(3) 211.01 states that it was illegal for Defendant to own or hold the Notes, regardless of whether they were in default. Rather, the Trust was merely a real estate mortgage investment conduit (REMIC, for short) created by the election of IRS Tax Code

860(g) for the payment of cash flows, with the Loans used as collateral. This particular REMIC contained no assets, as it was a bankruptcy-remote, tax-exempt investment conduit trust for the purpose of moving cash flows for Pass-Through Certificates. As such, the tax liability "passed through the trust" directly to investors to avoid double taxation. Of course, Deutsche Bank National Trust Company ("DBNTC") knew of these restrictions, as it was a T-1 license holder, governed by the Securities and Exchange Act of 1934 and the Trust Indenture Act.

9. Upon purchasing these cash flows from the Loans, the Certificateholders relied on various representations from the underwriters, rating company, the Depositor, and the Issuing Entity, including that the Loans passed the asset requirements of section 860(a)(1) and § 1.860G-1(a) or a residual interest as defined in section 860G(a) and § 1.860G-1(c) to be of the same type and contained the same risk factors – essentially, that they were all high-quality loans ("the Warranties"). The purpose of the Warranties was to induce the Certificateholders to buy the Certificates by giving the Certificateholders peace of mind that the Borrowers were likely to make their monthly Loan payments, enabling the Certificateholders to continue collecting an available monthly cash flow from the Trustee to the Certificateholders for many years thereafter. The Certificateholders' indenture agreement with the Depositor and the Issuer entitled the Certificateholders to the cash flows that would have been generated when the replacement of the cash flows or the replacement of the non-conforming loans took place.

10. DBNTC never owned or held the Note, either as Trustee or in its individual/corporate capacity. As Trustee, it owed fiduciary duties to the Certificateholders. The first duty was the obligation to review each loan and verify that it qualified for inclusion in the Trust. The second was to ensure the original lender purchased back the Notes that did not live up to the Warranties – the sole remedy available to Certificateholders.

11. DBNTC's most important duty to the Certificateholders, as stated in Trustee's duties 15 U.S.C. §77000 - Duties and responsibility subsection 15 U.S.C. §77ppp Prohibition of impairment of holder's right to payment, is the Trustee must pay cash flows to the Certificateholders. Notably, this duty is not contingent upon any other condition.

12. Notwithstanding the Warranties, the Loans were not high-quality loans. In fact, so many of the Borrowers stopped making their monthly payments that the Certificateholders were no longer collecting the cash flows they expected to receive when they bought the Certificates, and the Trustee was not fixing the problem by remitting the difference. As a result, the Certificateholders wanted to exercise their sole remedy by returning the Certificates to the Depositor and having their purchase price returned – essentially, a refund.

13. By 2008, however, the Depositor was no longer in business. As Trustee of the Trust, DBNTC was still responsible for collecting cash flows on behalf of the Certificateholders. Yet it was failing to do so. Soto, for example, stopped making payments under the Note in October, 2012 – one of many Borrowers who did so. As a result, a lawsuit was filed against Soto, Pinellas County Case No. 14-2579-CI ("the Lawsuit"), with Defendant named as plaintiff.

14. Also named as a defendant in the Lawsuit was 11717 81st Place Land Trust, Plaintiff herein (now prosecuting this action via its Successor Trustee, BCP Management, LLC). The genesis of the Lawsuit was DBNTC's attempt to foreclose the Mortgage and divest Plaintiff of ownership.

15. For several reasons, Defendant's prosecution of the Lawsuit was fraudulent, illegal, and perjurious, rendering the entire proceedings, and any rulings emanating from them, void.

16. First, Defendant was neither the owner nor the holder of the Note by operation of law. In fact, it was illegal for Defendant to own or hold the Note. Defendant knew this, yet they

intentionally represented otherwise in the Lawsuit, under oath, in a fraudulent, illegal, and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff, violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

17.   Second, the Lawsuit was brought in the name of the Trust, which were identified in the style of the Lawsuit. However, the beneficiaries of the Trust, *i.e.* the Certificateholders, did not authorize the Lawsuit, benefit from it, or even know it had been filed. Defendant knew the Certificateholders had no knowledge of the Lawsuit, yet it purported to prosecute it anyway – in its name, and under oath, no less – in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff. Defendant undertook these actions in its capacity as a Securities Administrator, thereby violating § 517.301 of the Florida Securities Fraudulent Acts Statute.

18.   Third, Defendant was purporting to prosecute the Lawsuit in its capacity as Trustee, yet it was illegal for it to act as Trustee, as its trust license had been revoked. Quite simply, it was illegal for DBNTC to conduct trust business. Defendant knew this, yet it continued falsely representing to the Court that it was prosecuting the Lawsuit as Trustee of the Trust.

19.   Despite the foregoing, the Servicers, purporting to act as Defendant's servicer and agent with authority to bind Defendant – caused the Lawsuit to be prosecuted in the name of DBNTC and represented, under oath, that Defendant was the owner and holder of the Note. As Defendant is not the principal of the Trust, however, there could be no "agents" or "attorneys-in-fact," as stated in Fla. Stat. § 709.2201.

20.   To support its position in the Lawsuit, various servicers ("the Servicers") took a series of actions that can only be described as fraudulent, void, perjurious, and illegal. (At any one time, only one servicer was assigned to the Loan. However, the servicer changed several times

5

during the duration of the Lawsuits, and each of them contributed to the frauds and illegalities described herein. As such, the Servicers may sometimes be identified in the singular, *i.e.* "the Servicer" and sometimes the plural, *i.e.* "the Servicers").

21. First, the Servicers knew the Lawsuit was not being prosecuted for the benefit of the Certificateholders, as the Certificateholders did not consent to the Lawsuit, know it had been filed, or stand to benefit upon a successful outcome. Nonetheless, the Servicers intentionally represented otherwise, even going so far as to make the Trust the plaintiff in the Lawsuit, to conceal that the Servicers were the parties who stood to benefit from the Lawsuit and to fraudulently shift adverse tax consequences in the event of a foreclosure from themselves to the Certificateholders.

22. Second, the Servicers knew that Defendant was not the owner or holder of the Note by operation of law. Nonetheless, the Servicers repeatedly represented otherwise in the Lawsuit, under oath, in a fraudulent and perjurious attempt to foreclose the Mortgage and steal the Property from Plaintiff.

23. Third, the Servicer and its attorneys caused to be recorded in the Official Records of Pinellas County Florida a Notice of Lis Pendens upon the filing of the Lawsuit. This recording was fraudulent, as it was predicated upon the fraudulent representations the Lawsuit and used as a forum to carry out these frauds and divest Plaintiff of title to the Properties, in violation of Fla. Stat. §§ 817.535(2)(a) and 817.54.

24. Fourth, the Servicer caused to be recorded in the Official Records of Pinellas County, Florida an assignment of mortgage ("the Assignment") at Book 18309, Page 2158. The Assignment was a complete fraud. After all, it was not prepared by the assignor, Mortgage Electronic Registration Systems, Inc. ("MERS"), in the ordinary course of business, but by the Servicer in a fraudulent effort to convey standing in the Lawsuit where none otherwise existed.

To illustrate, the Assignment purported to include a conveyance of monies owed, *i.e.* the Note, to the Defendant, yet MERS had no ability to assign the Note, as it was never a party thereto. Unfortunately, the Servicer represented otherwise in a fraudulent and illegal attempt to steal the Property from Plaintiff, in violation of Fla. Stat. §§ 817.535(2)(a) and 817.54.

25.     Fifth, the Servicer stamped on the Note a blank endorsement ("the Endorsement"), purportedly by SF, representing that it made Defendant the holder of the Note. The Endorsement, however, was a fraud. It was not placed on the Note by SF in the ordinary course of business, but by the Servicer in a fraudulent attempt to convey standing where none otherwise existed in a fraudulent and illegal attempt to steal the Property from Plaintiff, in violation of Fla. Stat. § 817.54.

26.     Sixth, the Servicers repeatedly represented, in the Lawsuit, that Defendant had been damaged as a result of Soto's non-payment of the installment payments due under the Note. This representation was knowingly false, fraudulent, and perjurious at all times relevant. After all, the Servicers knew they were responsible for paying fixed, monthly payments to the Certificateholders, *i.e.* the cash flows, regardless of whether the Borrowers paid the payments due under the Note. The Servicers did, in fact, make these payments to the Certificateholders, and those payments "passed through" Deutsche given its role as Trustee under the Trusts. Suffice it to say Servicer's repeated representations in the Lawsuit that Defendant was damaged as a result of Plaintiff's alleged failure to pay were a false, fraudulent, and perjurious effort to foreclose in Defendant's name where no basis to do so existed.

27.     Seventh, the Servicer filed in the Lawsuit a Limited Power of Attorney ("the LPOA") from DBNTC, representing that the LPOA gave it the power to act on its behalf and prosecute the Lawsuits as an agent of the Trust. These representations, however, were entirely fraudulent – and known to be so by all involved. In truth, the LPOA gave the Servicer no powers

7

at all, as it did not authorize the Servicer to take any actions that it was not already authorized to take under the terms of separate, written agreements identified therein. In addition, the LPOA expressly prevented the Servicer from filing any action in the name of Deutsche, a restriction which it expressly violated by prosecuting the Lawsuit. Moreover, the Servicer was never a T-1 license holder, so DBNTC could not delegate its authority to act as trustee to it (any more than an attorney can delegate another to practice law with his/her law license).

28. Eighth, the Servicers fraudulently misrepresented to their attorneys that they were the agent of Defendant and authorized to act on its behalf, intending to induce and actually inducing the attorneys to act as counsel of record for Defendant in the Lawsuit. In the process, the Servicers represented that the facts asserted in the Lawsuit, *e.g.* that Defendant was the owner and holder of the Note and was damaged by the Borrowers' non-payment, were true – knowing they were not. This put the attorneys in the position of either not knowing that the Servicers were using them to facilitate perjurious, fraudulent, and illegal acts (and facilitating that misconduct) or knowing the Servicers were doing so and actively participating in that fraud scheme. Either way, the attorneys facilitated perjury at the behest of the Servicers, and the Servicers' use of these attorneys to commit these illegal, fraudulent and perjurious acts has placed the attorneys in an irreconcilable conflict, forcing them to choose between the Servicers, *i.e.* the entities that were paying their bills, and Defendants, the entity for which they were counsel of record in the Lawsuits.

29. At all times relevant, DBNTC knew that the actions of the Servicers in the Lawsuits were fraudulent, illegal, contemptuous, and perjurious. Nonetheless, DBNTC has intentionally engaged in a years-long pattern of facilitating and ratifying the fraudulent and illegal acts of servicers on the one hand (including those described herein) while attempting to feign ignorance of their misconduct on the other so as to avoid liability.

30. For instance, in its capacity as Trustee, DBNTC has executed many limited powers of attorney. Its purpose in doing so was to create the appearance of an agency relationship even if one did not actually exist, enabling servicers to go to court and create the impression they were an agent of DBNTC and authorized to prosecute a foreclosure in their name and otherwise act on its behalf even if actual authority were lacking.

31. At the same time, though, DBNTC knew that servicers were using its name to perpetuate fraudulent, illegal, perjurious, and contemptuous acts. If this misconduct ever came to light, DBNTC wanted to have plausible deniability, *i.e.* a way of saying "that servicer wasn't our agent." That is why: (i) DBNTC insisted that all limited powers of attorney include language clarifying that they were not conveying any powers other than those already conveyed in separate agreements – meaning the LPOAs, despite conveying the impression of an agency relationship, conveyed no power at all; (ii) DBNTC insisted that the servicers indemnify it for all actions taken on its behalf; and (iii) when high-ranking officers within DBNTC, *e.g.* Ronaldo Reyes, were confronted with the illegal acts described herein, they disclaimed knowledge of the servicers' misconduct in any particular case, acknowledged that the servicers were not actually the agent of DBNTC, and conceded that it never owned or held any promissory notes.

32. Given repeated opportunities to disavow the fraudulent, perjurious, contemptuous, and illegal misconduct of servicers – perpetuated in the name of DBNTC, as Trustee – Ronaldo Reyes and Thomas Patrick, within the course and scope of their employment, did nothing. Worse yet, they not only ratified the misconduct, they continued conspiring with the servicers to conceal it from Plaintiff, the Certificateholders, and the public at large.

33. Despite its feigned ignorance, DBNTC knew full well what was happening. In fact, even after the details of the misconduct was addressed with Reyes, Patrick, and other, high-ranking

officers of Deutsche in detail, DBNTC failed to take remedial measures, continued to look the other way, and did nothing to stop the servicers and their lawyers from prosecuting foreclosures in its name. In fact, DBNTC continues to execute LPOAs for these Servicers, knowing the Servicers are using them to engage in the fraudulent and illegal misconduct described herein.

34.     Further proof that DBNTC "ignorance" of the Servicers' illegality was feigned, and that it knew full well what the Servicers were doing, is seen in the indemnification agreements between them and the Servicers. After all, when an indemnification agreement exists between a principal and an agent, the principal is typically the one who agrees to indemnify the agent for any actions taken in the scope of the agency relationship. Here, conversely, DBNTC, *i.e.* the principal, wanted Servicers, *i.e.* the agent, to indemnify it for all actions the servicers took in its name. The obvious reason for such an unusual indemnification is that DBNTC knew that servicers were using its name to engage in acts that were fraudulent, illegal, contemptuous, and perjurious, and DBNTC wanted someone else to pay in the event the fraud scheme ever came to light.

35.     Based on the fraudulent and illegal acts of Defendant and the Servicers, as described here, Defendant divested Plaintiff of title to the Property, depriving Plaintiff of the value thereof.

36.     Defendant and the Servicers spent many years working to conceal these fraudulent and illegal acts from Plaintiff, the public, and, to a lesser extent, Servicers' own attorneys. As a result, Plaintiff only learned of these facts in 2020.

## COUNT ONE

37.     This is an action arising under the Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101, *et. seq.*, for damages against Defendant in excess of $30,000, exclusive of interest, attorney's fees, and costs.

38. Plaintiff realleges and incorporates by reference paragraphs 1-36 above.

39. Defendant's misconduct, as set forth herein, constitutes violations of Fla. Stats. §§ 817.535, 817.54, and 772.103(1)-(4). To wit, through a pattern of criminal activity, the recording of the Lis Pendens in connection with the Lawsuit, the recording of the Assignment, the use of the Endorsement, and by endeavoring to commit and conspiring with the Servicers to commit the foregoing acts, Defendant divested Plaintiff of possession and ownership of the Property when it had no lawful basis to do so.

40. As a result of these violations, Plaintiff has been damaged. These damages include, but are not limited to, the value of the Property, all attorney's fees incurred in defending the Lawsuit, and all interest on that money.

41. Under the terms of Fla. Stat. § 772.014, Plaintiff is entitled to triple damages.

WHEREFORE Plaintiff demands judgment in her favor and against Defendant for damages, general and special, treble damages, costs, interest, attorney's fees, and such other and further relief that this Court deems proper. Plaintiff further demands trial by jury.

Dated: October 19, 2020

>*/s/ Lee Segal, Esquire*
>Lee Segal, Esquire (FBN: 37837)
>**Segal & Schuh Law Group, P.L.**
>18167 U.S. Highway 19 North, Suite 100
>Clearwater, Florida 33764
>Tel: (727) 824-5775 Fax: (877) 636-7408
>lee@segalschuh.com – Attorney
>marie@segalschuh.com – Florida Registered Paralegal